# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information associated with David I. Stein, Sharon Stein, and Milwaukee Pain Treatment Services that is stored at premises owned, maintained, controlled, or operated by Alexssa Enterprises, Ltd., more fully described in Attachment A

)
)
)
)
)
)

Case No. 19-M-073

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
Title 21, United States Code, Section 841(a)(1) and 846; Title 18, United States Code, Section 1956; and Title 18, United States Code, Section 1347

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Jill Dring, FBI
Printed Name and Title

Sworn to before me and signed in my presence:

Date: Apr 18, 2019

_____
Judge's signature

City and State: Milwaukee, Wisconsin

David E. Jones, U.S. Magistrate Judge
Printed Name and Title

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jill Dring, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by Alexssa Enterprises, Ltd., an electronic communications/remote computing service provider headquartered at 301 N. Main Street, West Bend, WI 53095. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Alexssa Enterprises, Ltd. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.      I am a Special Agent with the FBI, and have been since March of 2013. I am currently assigned to the FBI Milwaukee Division's White Collar Crimes squad. As a Special Agent with the FBI, I have investigated criminal matters related to heath care fraud and cyber matters to include matters involving kickback schemes, fraudulent billing and the illegal sale of opioids through the internet. I have also investigated violations of the Controlled Substances Act by doctors. I have received training in health care violations. With regard to this matter, I am collaborating with Federal law enforcement officers, including the United States Department of Health and Human

Services Office of Inspector General ("HHS-OIG"), the Drug Enforcement Agency ("DEA") and the Internal Revenue Service ("IRS").

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of (1) Title 21, United States Code, Section 841(a)(1) and 846; (2) Title 18, United States Code, Section 1956; and (3) Title 18, United States Code, Section 1347 have been committed by David I. Stein, Sharon Stein, and Milwaukee Pain Treatment Services ("MPTS"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE TO BELIEVE CRIMES HAVE BEEN, AND ARE BEING, COMMITTED

6.      Federal and state law enforcement partners have been investigating Dr. David Stein ("Stein"), his wife, Sharon Stein ("Sharon") (collectively, the "Steins") and

MPTS since approximately July 2018. Over the last eight months, we have interviewed various individuals to get first-hand accounts of Stein's prescribing and the dangers it has created, including: many current and former MPTS patients; several former employees, including five office staff members and three physical therapists, whose tenure at MPTS spans more than a decade; a number of pharmacists who have raised concerns about Stein's prescribing and refused to fill Stein prescriptions; and families of patients who have died of drug overdose while under Stein's care. We have reviewed records made available to us by the Milwaukee County Medical Examiner's Office, which have allowed us to identify patients of Stein who have died of overdoses, many within days of being prescribed opioids by Stein. We have also extensively analyzed Stein's prescribing and Medicare and Medicaid billing records, which show Stein as an extreme outlier in terms of his opioid prescribing practices and provide corroboration for the statements made by patients and employees about his prescribing, billing, and other practices. We have also reviewed documents made available to us by other federal and state agencies documenting their audits, complaints and investigations into Stein, Sharon and MPTS over the years.

7.      On March 28, 2019, federal law enforcement agents executed a search warrant at MPTS.

8.      The interviews and data analysis summarized below reflect only a portion of the evidence we have collected to date.

9.      Based on our investigation, there is probable cause to believe that Stein, conspired with his wife, Sharon and others, to distribute controlled substances outside

the course of standard medical practice through his pain management clinic, MPTS, in violation of 21 U.S.C. §§ 841 and 846. There is also probable cause to believe that the Steins conspired to, and did, execute a scheme to defraud federal health care programs by, among other things, performing (and billing for) unnecessary medical procedures in violation of 18 U.S.C. § 1347, and to believe that the Steins have engaged in financial transactions involving proceeds of these illegal activities with the intent to promote these activities, and in an effort to conceal the nature of these proceeds in violation of 18 U.S.C. § 1956.

### Background of the Business

10. Interviews of a former employee ("Employee 1") disclosed that the Steins began operating at 5400 N. 118th Court, Milwaukee, Wisconsin in the mid-2000s. Prior to that time, the Steins operated out of a smaller office in Milwaukee, at which they operated a (mostly) legitimate pain-management practice. Shortly after moving to the new space, mounting financial pressures, apparently related to maintaining a larger office space and staff, led the Steins to dramatically change operating practices.

11. According to Employee 1, who worked as a medical biller at MPTS until mid-2015, at the time of the move to 5400 N. 118th Court, patient volume doubled from 15-20 patients per day to 30-40 patients per day. At times, Stein would see 60 or more patients per day. Another former employee, who worked as a patient coordinator in 2017 and 2018 ("Employee 3"), estimated that Stein saw 50 or more patients per day. Typically, this meant that Stein would spend less than 3 minutes with each patient prior to providing them with a controlled substance prescription.

12.     Employee 1 and another former employee, Employee 2 (who worked in an office manager role from 2012 to 2015), described similar office procedures aimed at increasing profitability and resulting in unlawful distribution of controlled substances and/or health care fraud.  Much of what Employee 1 and Employee 2 have described about the way the office operated during their employment was corroborated by interviews with Stein's patients, complaints received by the DEA from pharmacists, complaints received by state agencies from former employees of the clinic or third-party providers, and data collected regarding Stein's prescribing.

13.     Based on my training and experience, the below categories of Stein's practices are red flags that are often seen in medical practices that are operating as pill mills, or places serving as drug distribution centers rather than legitimate medical practices.  These practices also suggest that the Steins are performing unnecessary medical treatments and/or fraudulently billing healthcare programs for medical treatments.  These practices show that there is probable cause to believe that the Steins are violating the Controlled Substances Act and committing health care fraud.

*Unusual Patient "Contracts" and Clinic Restrictions.*

14.     I reviewed documents obtained from a 2015 Medicaid audit of MPTS, which included contracts MPTS had with patients.  In those contracts, patients affirmed that they are not working with law enforcement.  The contracts also stated that Stein "bears no responsibility for any illegal or negligent acts…associated with the prescription narcotics."

15.    Patients have also reported that Stein requires patients to leave their cell phones in a basket outside the examining room.  Employees 1 and 2 confirmed this procedure is due to the Steins' fear of being recorded by patients.

16.    On March 26, 2019, case agents interviewed current patient R.R.  Patient R.R. was hesitant to speak to case agents because she said she signed a contract with Stein agreeing not to talk to the police or media about Stein.

17.    Numerous other patients interviewed also indicated that they signed documents stating that they were not working with law enforcement.

*Procedures Performed, and Medical Decisions Made, by Unlicensed Staff*

18.    Sharon does not have a medical degree or any medical training.  Despite that, former employees and patients have routinely described Sharon as being "in charge" and "running the place."

19.    According to two former employees, Sharon performed medical procedures such as epidural injections. For example, Employee 4, who worked at MPTS for several months during the summer of 2017, stated that Sharon claimed she was a Registered Nurse Practitioner.  Employee 4 believed that Sharon was performing epidural injections because Sharon arrived at the office earlier than Stein and patients came in to receive epidurals at times in the morning when it did not appear that Stein was in the office.  Employee 4 stated that Sharon said it was okay for her to do the epidurals because she claimed she was a Registered Nurse.

20.    Similarly, Employee 5 worked at MPTS in May 2018.  Employee 5 had responsibility for, among other things, bringing patients back to examination rooms.

During the course of performing those duties, Employee 5 witnessed Sharon do injections. A patient also told Employee 5 that Sharon did the injections.

21.     Sharon also decided what to prescribe and signed prescriptions. Employee 4 stated that she saw prescriptions signed by Sharon using Stein's name. Employee 5 stated that Sharon also decided what type of drug, strength and dosage to prescribe to the patients and Stein followed those decisions. Current Patient P.B. told law enforcement that Sharon is the one who writes the prescriptions and gives them to patients as they leave the visit with Stein. Similarly, current Patient R.R. stated that she saw Sharon fill out and sign prescriptions.

22.     During execution of the search warrant of MPTS on March 28, 2019, law enforcement located several blank, pre-signed prescriptions.

*Significant Numbers of Cash-Pay Patients*

23.     Based on my training and experience, pain management clinics that service a large number of cash-pay patients present a red flag indicative of over-prescribing. Most patients who require pain management services have insurance that will cover the cost of visiting a pain management specialist with a small co-pay. But, doctors, like Stein, who over-prescribe and over-bill, often find it difficult to remain within-network at insurance providers. Indeed, Stein was suspended from Medicaid's program in 2016. Such doctors often require patients to pay cash and patients will often

choose to pay the large cash fees because doing so ensures that they will reliably and consistently receive opioids without a legitimate medical purpose.

24.     Employees 1, 2, 3, 4, and 5 described MPTS as serving a significant number of cash-pay patients. Many of these patients had health insurance, but paid Stein in cash. Indeed, many of Stein's patients have Medicare or Medicaid (as evidenced by the way in which they pay for their prescriptions at the pharmacy), but choose to pay large amounts of cash to see Stein because they reliably and consistently receive opioids without a legitimate medical purpose.

25.     During execution of the search warrant on March 28, 2019, law enforcement located multiple boxes of records containing receipts for money orders, confirming that a significant number of Stein's patients pay Stein in cash.

*Financial Records and Management*

26.     According to Employee 1, Sharon was responsible for the financial management of the business. When the clinic initially began accepting cash, Sharon would collect the cash at the end of the day, put it in her purse, and take it to the bank for deposit. Over time, however, Employee 1 noticed fewer deposits into the company account, despite the fact that Sharon continued to take the day's cash with her at the end of the night. Employee 1 was told by Stein's daughters that the Steins had a cash drawer at home. Employee 1 also overheard Sharon telling her nanny to take cash out of the cash drawer. Employee 2 also stated that Sharon took cash from the office home with her.

27.    I have been informed of the DWD records of MPTS from 2010 to 2018. I have also been informed of the contents of bank statements showing deposits made to bank accounts of Natalie Stein and Jacqueline Stein (the Steins' daughters). MPTS DWD records show that Natalie Stein has been paid $280,511.19 by MPTS from 2010 to 2018. Those same records show that Jacqueline Stein has been paid $135,536.39 during the same time period. Bank records also show that Natalie and Jacqueline receive even-dollar amount checks from MPTS that do not appear to match up to their payroll payment amounts every month. For example, on June 28, 2013, Natalie Stein received a check for $1,600 from MPTS.

28.    Based on my review of public records, Natalie Stein lives in Manhattan, New York. Jacqueline Stein lives in Paris, France. During my interviews with Employee 1, Employee 1 stated that Steins' daughters sometimes worked in the office during school breaks, doing filing. Employee 1 was unaware of any work that the Steins daughters were (or even could be) doing remotely. Based on my training and experience, and given the nature of the business, it is unlikely that Natalie and Jacqueline Stein are working for the MPTS remotely to earn those salaries and payments. These payments appear, therefore, to be indicative of money laundering.

29.    I am aware that DWD records and bank records also show that David and Sharon Stein appear to be receive even-dollar amount checks from MPTS that do not appear to correspond to their payroll amounts.

*Lacking Physical Exams*

30.     Based on my training and experience and knowledge gained from other law enforcement agents, I know that a doctor spending just a few minutes with a patient prior to prescribing controlled substances is an indication that the doctor is prescribing controlled substances without a legitimate medical reason.

31.     Both Employee 1 and Employee 3 described physical exams by Stein to be extremely short. Employee 3, who worked at the clinic in 2017 and 2018, said that initial exams lasted approximately 30 minutes, but that subsequent exams were only 1-3 minutes long. Employee 3 was often present for these exams. She stated that Stein never took the patient's vitals or asked patients questions about the medications. If a patient's medication wasn't working or was causing side effects, it was up to the patient to raise the concern. Employee 4 confirmed that patient visits lasted *at most* 10 to 15 minutes.

32.     Patients have confirmed the cursory nature medical visits at MPTS. For example, Patient K.S., stated that during her first visit nobody took any of her vitals and Stein did not conduct a physical examination. Instead, Stein only asked her to bend over and touch her toes. After that cursory "examination," Stein told Patient K.S. to start receiving epidural shots every other month in order to receive prescriptions. The initial visit lasted 5-10 minutes, after which Patient K.S. was given prescriptions for Percocet and Oxycontin. Patient K.S. stated that every subsequent visit lasted five minutes and she never received a physical exam or had vitals taken.

33.     Patient C.M. described a similar visit protocol.  She stated that an appointment with Stein lasted only five minutes, during which Stein would ask her to touch her toes and bend backwards for a bit.

34.     Multiple current and former patients describe the same pattern for visits to Stein: a cursory appointment followed by receipt of a prescription for opioid medications.

*Pay-For-Play: Epidural Injections in Exchange for Opioid Prescriptions*

35.     According to patients, MPTS was known as the place where "shots" were required.  This is because Stein required a significant percentage of his patients to get either epidural or facet joint injections or both.  The system of injections was essentially a "pay for play" scheme whereby patients would receive opioid prescriptions if they participated in the required injection therapy.  According to Employee 2, Sharon would often tell patients who complained about getting injections that she would authorize their prescription for the month, but that "next month you have to get epidurals."

36.     Moreover, almost every single injection provided at MPTS was billed to government payors using two codes: the initial injection code as well as an add-on code.  By using the add-on code, MPTS received two payments from the payor for a single procedure; one payment amount is associated with the base code and a separate, additional payment comes as result of the add-on code.  Based on my investigation, these add-on codes are typically the exception, rather than the rule.  Analysis provided by state agents indicates, for example, that Stein was the top biller to Medicaid of the epidural add-on code in the state of Wisconsin from a review period of March 2015

through March 2018, despite being suspended from Medicaid for the majority of that time period. Stein was paid $32,101 of the total $93,794 paid by Wisconsin State Medicaid for this add-on code during that time period, again despite his suspension from Medicaid payments between July 2016 and the present.

37.     According to Employee 2, patients often complained about having to receive the injections. They continued to accept the injections, however, because it was the only way to receive prescriptions for opioids. Employee 2 confirmed and emphasized that these shots were a prerequisite to receiving opioid prescriptions.

38.     Patient C.M. was interviewed on September 11, 2018. C.M. stated that she went to see Stein in 2013 based on a referral from her primary care physician. Patient C.M. described long lines and a waiting room filled with 25-30 people. She said patients were coming in and out like it was a "drug house." During her first visit, Patient C.M. received prescriptions for Percocet and Gabapentin. Stein also discussed injections with Patient C.M. during her first visit and told her that she would not get her prescription if she did not get the injections. Patient C.M. said that people in the waiting room talked about injections, asking her: "Are you new here? Because Stein is going to want you to get injections."

39.     Patient K.S. also described receiving epidural injections and "facet" shots. When she complained to Stein that the shots didn't relieve her pain, Stein insisted that she continue receiving the shots in order to continue receiving the prescriptions and prevent from being discharged by MPTS. Patient K.S. stated that Stein noted in her medical records that her pain was reduced by 50% from the shots even though Stein

never asked her if the shots worked and despite the fact that she complained to him that they did not. Patient K.S. stated that at some point she asked Stein to increase the number of 15mg Oxycodone tablets she was taking. Stein did not increase the number, but increased the dosage to 30mg on November 18, 2015. Patient K.S. then again asked to stop the injections, but Stein declined and told her that if she didn't get injections and do physical therapy she would not receive any more prescriptions. He also told her that she would go into "withdrawal" and "get sick" if she didn't "get pills."

40. Stein recommended epidural injections to Patient M.D. who was seeing Stein because of fire burns to her hands, back of her head, and back. No previous doctor had ever recommended injections.

41. Patient P.E. saw Stein on and off from 2014 to March 2018. Patient P.E. allowed Stein to give him shots because Stein told Patient P.E. that he could not get his prescriptions without the shots. Patient P.E. did not have an understanding of what the shots were and did not think they worked.

42. Current patient R.R. described receiving injections that she felt caused more pain than they alleviated. She was also told by her insurance company that the injections were not going to do any good.

*MPTS' Problematic Relationship with Physical Therapists*

43. According to Employee 2, MPTS employed on-site physical therapists prior to 2015. After 2015, MPTS contracted with Alliant Physical Therapy to provide on-site physical therapy services to patients. Employee 2 understood that part of the agreement with the third-party physical therapy company required Stein to refer a

certain number of physical therapy patients per week. Employee 4 was responsible for scheduling patients for physical therapy. She was directed to try to get the patients to go to the physical therapists co-located in the MPTS space.

44.     Physical Therapist 1 worked for Stein from 2012 to 2014. He confirmed that many of the patients he saw were not interested in the physical therapy, and wouldn't do the exercises. According to Physical Therapist 1, these patients seemed to be going through the motions in order to get their pills.

45.     Physical Therapist 1 stated that he thought a significant number of the patients were pill seekers. When patients failed to show up for physical therapy multiple times, Physical Therapist 1 would discharge them. But Sharon and Stein frequently overrode his discharge decisions and allowed the patients to come back to the clinic.

46.     Physical Therapist 1 also stated that many of his patients complained about "surgeries" performed by Stein. Physical Therapist 1 believed that these weren't appropriate and raised concerns with Stein about patients on at least seven (7) different occasions.

47.     Physical Therapist 1 stated that Stein recorded his conversations with Physical Therapist 1 and Physical Therapist 1 believed that Stein also recorded conversations with patients.

48.     Physical Therapist 2 worked at the clinic from late 2014 through early 2015. She left because she thought that working there put her license at risk. Physical Therapist 2 confirmed that patients were required by Stein to do physical therapy in

order to get prescriptions and felt that the Steins were more focused on making money than helping patients. For example, on one occasion one of Physical Therapist 2's patients was struggling because her daughter had just passed away. Physical Therapist 2 told her to go home and take care of herself, but Sharon disagreed and demanded that the patient stay for the therapy.

49. On other occasions, Physical Therapist 2 noticed that patients would report that their pain was at level 0 for several weeks in a row. Physical Therapist 2 attempted to address these issues with Stein and to request that Stein reduce the patient's opioid dosage to allow them to determine whether the opioids were masking the pain or the patients were getting better. Physical Therapist 2 did not get a response from Stein and Stein did not change the patient's course of treatment.

50. Physical Therapist 3 worked at MPTS from 2008 to 2010. Physical Therapist 3 stated that Sharon told patients that completing physical therapy was a prerequisite to getting their opioid prescriptions. Physical Therapist 3 felt that about half of the patients did not need physical therapy, and she relayed that opinion to Sharon, who stated that patients must complete the physical therapy regardless. If Physical Therapist 3 discharged a patient from physical therapy, Sharon would yell about it.

*Urine Drug Screen Policies and Billing*

51. In addition to being known as the "easier" place to get pills, patients also apparently knew that they could continue to receive prescriptions despite testing positive for other controlled substances on the required urine drug screens.

52.     Employee 2 described knowing that patients were falsifying urine drug screens. For example, some patients turned in urine samples that were heated. Employee 2 witnessed hand warmers and condoms in the bathrooms, indicating that patients were bringing in urine to pass the tests. Other times, patients would put what appeared to be crushed up pills in urine to ensure a urine screen would test positive for the opioids they were taking. When Employee 2 informed the Steins of observing these facts, patients would only sometimes be discharged. Other times, these patients were coached by the Steins on what levels needed to be seen in the screens to obtain prescriptions. Still other times, patients would be given prescriptions for opioids despite these facts. According to Employee 1, which patients were discharged after a failed drug screen and which patients were given prescriptions depended largely on the type of payment method. Workers' Compensation patients were almost never discharged for failed drug screens, whereas Medicaid patients were frequently discharged or given piecemeal prescriptions.

53.     Some patients who had repeated failed urine drug screens were referred to Dr. Douglas Lyman. Lyman had a relationship with MPTS, specifically with Sharon. According to Employee 2, if referrals had been light, Lyman would call the office asking if there was any business for him. Employee 2 stated that when he did so, Sharon and Stein responded by coming up with a list of patients to refer to Lyman. After patients visited Lyman, they were allowed to return to MPTS and to obtain prescriptions.

54.     Employee 4 stated that some patients who had "dirty" urine drug screens were allowed to retest.  The determination was made based on Sharon's "mood" or relationship with the patient.

*Excessive Opioid Prescribing*

55.     Both Employee 2 and Employee 1 described Stein as a "legal drug dealer." Both indicated that, in their view, a majority of the patients seen at MPTS were drug seekers and not in legitimate pain.  Employee 2 stated that she heard both Stein and Sharon comment that the patients were just going to sell the pills anyway and that they did not care.

56.     Employee 3 echoed these sentiments.  She stated that, based on her observations, approximately 30 of the 50 patients seen each day were there just to get pills and not for legitimate reasons.  Employee 3 stated that it was obvious to anyone who wasn't "stupid" that these patients were not in pain, and that they didn't care about their treatment, but only about getting prescriptions.  Employee 3 stated that Stein was not stupid and knew what was going on.  On occasion, when discussing a potential new patient Stein would say things like: "It sounds like this person just wants some pills, but just bring him in anyway and we'll see what happens."  Employee 3 also stated that Stein never rejected a patient due to a normal MRI noting that even if the "MRI clearly showed nothing was wrong, we didn't discharge the patient."

57.     Employee 4 stated that sometimes family members of patients would call the clinic and report that their family member was selling their prescription medications on the street.  Employee 4 did not tell the agents what she did with this information, but

the fact that MPTS received reports that their patients were diverting medications provides additional corroboration for the belief held by patients and employees that Stein was prescribing controlled substances outside the course of legitimate medical practice and that he had reason to suspect that doing so was creating the risk of harm to patients and others.

58.     Employee 2 also stated that prior to the implementation of PDMP, Stein would start an 18-year old, cash patient without imaging to support a diagnosis on 30mg of Oxycodone. After PDMP was put in place, pharmacists started to question Stein's prescribing and Sharon told Stein to start patients on a lower dose. Employee 2 states that she was in the exam room with Stein and a new patient when Stein told the patient something along the lines that he had to start them on a lower dose, but that he would raise it. Stein told the patient, "Don't worry. I'll get you there."

59.     These observations are supported by data, complaints from pharmacists, and patient interviews.

60.     For example, Stein's prescribing data shows an excessive level of prescribing. My colleagues at DEA identified several types of Oxycodone that are the most highly diverted: Oxycodone 30mg, 20mg, 15mg and 10mg, each strength without any abuse-deterrent properties.[1] We then worked with other federal authorities to identify the highest prescribers of those Oxycodone pills. Based on Medicaid paid

---

[1] Some versions of Oxycodone have an extended release, 12-hour abuse deterrent which causes the tablets to be resistant (via physical and/or chemical means) to manipulation and create a barrier to unintended administration, such as chewing, nasal snorting, smoking, and intravenous injection.

prescription data from January 2017 to May 2018, Stein was the top prescriber of these highly-diverted types of Oxycodone in Wisconsin to Medicaid patients, having prescribed more than twice the amount of Oxycodone as the next most-prolific prescriber in the state. He was also the top Fentanyl prescriber in the state based on the same Medicaid paid prescription data.

61. In reviewing his prescribing across payors, data shows that Stein prescribed Schedule II narcotics, and Schedule IV benzodiazepines in disproportionately high volumes compared to similarly situated practitioners (i.e., other pain treatment doctors). For example, in June 2017, Stein prescribed 49,852 Oxycodone 30mg tablets, 52,892 Oxycodone 15mg tablets, 21,046 Oxycodone 10mg tablets, and 355 fentanyl patches. These numbers are consistent with surrounding months.

62. Stein's PDMP also shows particularly high MME. As of November 2018, Stein's PDMP sorted by patient and prescription date showed that 42% of patients on a particular prescription date received prescriptions with an MME of 180mg MME/day. That is double the amount the CDC directs doctors to avoid prescribing and more than three times the amount that the CDC has determined doubles the risk of overdose.[2]

---

[2] The Centers for Disease Control and Prevention (CDC) publishes a conversion chart that provides conversion factors for various opioids to calculate the MME of doses of that opioid. "Calculating Total Daily Dose of Opioids for Safer Dosage," CDC, available at https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf. For instance, Oxycodone has a conversation factor of 1.5 per mg/day, so taking one 20 mg pill of Oxycodone per day would have a MME/day of 30. A more powerful opioid, hydromorphone, has a higher conversion factor of 4 per mg/day, so a prescription to take three 4 mg pills of hydromorphone per day would equal a MME/day of 48.

"CDC Guideline for Prescribing Opioids for Chronic Pain," CDC, March 18, 2016, available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm#T2_up.

63.     The PDMP analysis also revealed other red flags indicative of a pill mill, such as patients traveling long distances, including out of state, to Stein's office, and patients being prescribed a drug combination known as the "holy trinity" which includes an opiate, a benzodiazepine, and a muscle relaxer such as carisoprodol (Soma). This combination is sought out by drug seekers because of the euphoric high produced when taken.

64.     The PDMP data also shows a sudden decrease in Stein's Oxycodone 30mg prescribing starting in early 2018. He decreased his prescription volume from approximately 35,332 Oxycodone 30mg pills in January 2018 to 0 Oxycodone 30mg pills by August 2018. At the same time, Stein increased his prescribing of Oxycodone 10mg and 15mg pills. This new prescribing trend indicates that Stein may have begun to reduce prescriptions to more appropriate levels starting in 2018, although conversations with current patients indicate that he continues to prescribe controlled substances outside the course of standard medical practice. The reduction in prescriptions may be explained by correspondence received by Stein as detailed in Paragraph 104, below.

65.     According to current patient C.W., Stein received a letter from Dr. Yarbrough, a Medical Director for the Wisconsin State Department of Health Services on January 2, 2018. That letter addressed Patient C.W.'s Oxycodone prescription, advising that it was a high dose (above 100 MME), which carried risk. The letter advised Stein to review the patients' dosage and explore alternatives. Stein gave a copy of the letter to C.W. and required her to sign a document acknowledging receipt. He also advised her to contact Dr. Yarbrough. C.W. did so and Dr. Yarbrough directed her

to have a conversation with Stein. C.W. stated that she believed Stein received similar letters regarding other patients and also had them acknowledge receipt and contact the medical director. C.W. stated that the basis for this belief was that Stein presented C.W. with a form to sign, which led her to believe others had to do the same. This correspondence may be the reason for the sudden decrease in prescriptions seen in to start in early 2018.

*Overdose Deaths of Stein's Patients*

66.     The risks outlined by the CDC with respect to prescribing practices such as those seen in Stein's PDMP data have become a reality for a significant number of Stein's patients. I have reviewed Medical Examiner reports related to Stein's patients. Those reports show that over the past four years, at least nine of Stein's patients died from overdose-related causes. Seven of those patients were prescribed opioids by Stein less than two weeks prior to their death, with the majority of those filling their prescriptions just days before their overdose. Based on my training and experience, these deaths present a red flag that Stein may be prescribing Schedule II narcotics outside the course of normal medical practice and in violation of the law.

## PROBABLE CAUSE TO BELIEVE EVIDENCE OF THESE CRIMES CAN BE FOUND IN DATA STORED BY ALEXSSA ENTERPRISES, LTD.

67.     During execution of the search warrant at MPTS on March 28, 2019, law enforcement learned that most of the electronic records, including patient records and clinic communications, are stored on cloud-servers operated by Alexssa Enterprises, Ltd.

68. Alexssa Enterprises, Ltd. is an Information Technology company that provides a number of services including, information technology security, information technology management, website hosting and assistance, video surveillance, and cloud computing services including Office 365, Hosted Services, and Cloud File Sharing. Alexssa's Cloud File Sharing services allow businesses to "store files in the cloud" and allow those "files to be accessed anywhere there is an internet connection."

69. In general, providers like Alexssa Enterprises, Ltd. ask each of their subscribers to provide certain personal identifying information when registering for an account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, e-mail addresses, and, for paying subscribers, a means and source of payment (including any credit or bank account number). Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

70.     In some cases, account users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

71.     Based on my training and experience, as well as records analyzed to date, the data stored at Alexssa Enterprises Ltd., which may include patient files and records, financial and business management documents, as well as communications between and among Sharon and Stein, and between MPTS, Sharon, Stein and patients, contractors, service providers, and referral sources will provide evidence of prescriptions of controlled substances without legitimate medical purpose and unnecessary medical procedures fraudulently billed to health care programs.  Financial records available through Alexssa Enterprises, Ltd. will provide evidence of financial transactions intended to promote, and conceal, unlawful distribution of controlled substances and fraudulent healthcare billing.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

72.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Alexssa Enterprises Ltd. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information

described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

73.     Based on the forgoing, I request that the Court issue the proposed search warrant.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with David I. Stein, Sharon Stein, and Milwaukee Pain Treatment Services that is stored at premises owned, maintained, controlled, or operated by Alexssa Enterprises, Ltd., 301 N. Main Street, West Bend, WI 53095, a company headquartered at 301 N. Main Street, West Bend, WI 53095.

# ATTACHMENT B

## Particular Things to be Seized

**Information to be disclosed by Alexssa Enterprises, Ltd.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Alexssa Enterprises, Ltd., regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Alexssa Enterprises, Ltd., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Alexssa Enterprises, Ltd. is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

b.  The types of service utilized by the user;

c.  All records or other information stored by an individual using the account, including:

1.     Patient files (as specified in Attachment C), including but not limited to the complete patient files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical forms, treatment plans, referrals, consultations, correspondence, patient contracts, patient information, demographic information, and certificates of medical necessity;

2.     Records reflecting any polices or procedures of the clinic, including but not limited to billing and training policies and procedures.

3.     Records of patient complaints, allegations of substandard care, and unnecessary services performed by representatives, employees and agents of the clinic.

4.     Records related to employees and personnel including but not limited to resumes, application forms, licenses, job descriptions, time sheets, employment agreements, management reviews, hiring records, termination records, contracts, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former clinic owners, officers, employees and independent contractors.

5.     Communications in any form involving current and former clinic owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial services providers, potential or actual patients, insurance companies, or government entities to the extent the communications may relate to the crimes under investigation.  This includes communications between any employees of the clinic and the clinic itself and communications between and among any of the entities referred to herein.

6.     Audio or video recordings, stored in any format, of communications between, or statements of, current and former clinic owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial service providers, potential or actual patients, security guards, and physical therapists.

7.     Contracts with any current or former patients, vendors, affiliates, referral sources, independent contractors, or physical therapists.

8.     Records that tend to show the activities, location, or compensation of current and former clinic owners, officers, employees and independent contractors, referral sources, or physical therapists including:

a.  Calendars, schedules, appointment books, timesheets, or address books;

b.  Compensation agreements and payments; or

c.  Documentation related to purchase or other transfer of assets.

9.  Corporate records for the clinic, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities.

10.  Financial records reflecting the earnings, income, profits, and assets of the clinic and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors.

11.  Records, in any form, of payments made to or from MPTS, David Stein or Sharon Stein.

d.  All records pertaining to communications between Alexssa Enterprises, Ltd. and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## I. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (distribution of controlled substances outside the usual course of professional practice and without a legitimate medical purpose and conspiracy to unlawfully distribute controlled substances); Title 18, United States Code, Section 1956 (money laundering); and Title 18, United States Code, Section 1347 (Healthcare fraud), involving Sharon Stein, David Stein, and Milwaukee Pain Treatment Services since January 1, 2008, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Treatment of patients, including but not limited to prescriptions for controlled substances, physical therapy, and epidural and facet injections;

(b) Contracts with services providers and/or referral sources;

(c) Communications between or among clinic owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial services providers, potential or actual patients, insurance companies, or government entities to the extent the communications may relate to the crimes under investigation.

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate

evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# ATTACHMENT C

Patient files and records to be seized related to the following individuals.

1. Austin, Cale B. DOB 6/8/1988

2. Austin, Dwight DOB 12/14/1965

3. Bahr, Troy DOB 7/29/1972

4. Bell, Jacqueline DOB 5/24/1954

5. Benjamin, Clinton DOB 3/14/1974

6. Bridges, Pamela 11/08/1972

7. Brown, Bobbie DOB 12/04/1961

8. Brown, Joyce DOB 6/19/1972

9. Broyld, Sammie DOB 11/12/1970

10. Carrington, Donnis DOB 10/10/1974

11. Collingwood, Marguerite 08/04/1990

12. Daniels, Sherrill DOB 05/25/1979

13. Davis, Relanda DOB 01/21/1969

14. Dyson, Mechelle DOB 07-19-1969

15. Eady, Prince DOB 3/16/1956

16. Einwiller, Janos DOB 12/01/1977

17. Fitzpatrick, Laquana DOB 04/03/1979

18. Ghivan, Stephanie DOB 08/30/1960

19. Gonzales, Dawn DOB 12/29/1980

20. Grim, Jamie DOB 4/4/1978

21. Grochowski, Frank J.  DOB 10/13/1964

22. Hair, Charles L. DOB 12/9/1958

23. Hill, Emmanuel B. DOB 08/26/1967

24. Hoffmann, Timothy D. DOB 11/16/1960

25. Hough, Glen 05/02/1954

26. House, Kevin DOB 8/31/1957

27. Ignasiac, Christopher L. DOB 08/25/1975

28. Johnson, Vincent DOB 7/26/1972

29. Kildau, Candice DOB 09/05/1980

30. Kildau, David DOB 12/9/1949

31. Lorenson, Pamela 09/28/1953

32. Lorenson, Stephanie 02/05/1985

33. Luedtke, Tiffany 02/23/1982

34. Madosh, Marilyn DOB 10/29/1980

35. Madosh, Violet DOB 02/08/1987

36. Martin, Charlene  DOB 09/06/1960

37. Martin, Myra DOB 12/6/1986

38. McClelland, Wendell DOB 4/2/1958

39. Mesick, Kristi L. DOB 09/07/1965

40. Metzger, Justin DOB 05/19/1980

41. Michalski, Dawn DOB 03/09/1971

42. Moss, Margaret DOB 3/21/1967

43. Murphy, Bryson 10/21/1986

44. Nicholson, Natasha DOB 1/4/1988

45. Oliver, Janice DOB 7/21/1960

46. Pierce, Laverne DOB 8/6/1957

47. Pofahl, Tracy K.  DOB 2/13/1972

48. Ramirez, Ernestine 11/14/1956

49. Riley, Gwendolyn DOB 12/13/1957

50. Rodriguez, Raquel R. 11/24/1968

51. Ross, Sherry DOB 08/02/1960

52. Schuab, Kevin DOB 2/7/1962

53. Schuller, Karen DOB 9/16/1957

54. Thomas, Angela DOB 7/7/1968

55. Thompson, Johnathan D.L. DOB 3/23/1983

56. Thornton, Phyllis DOB 7/12/1961

57. Vasser, Deanna M. DOB  8/9/1972

58. Warr, Caprice DOB 1/16/1977

59. Weakley, Lisa Michelle DOB 03/10/1970

60. Zawacki, Lisa Jeanne DOB 11/8/1978

61. Zolicoffer, Tenika 04/25/1979

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Alexssa Enterprises, Ltd., and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Alexssa Enterprises, Ltd. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Alexssa Enterprises, Ltd., and they were made by Alexssa Enterprises, Ltd. as a regular practice; and

b. such records were generated by Alexssa Enterprises, Ltd.'s electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Alexssa Enterprises, Ltd. in a manner to ensure that they are true duplicates of the original records; and

9

2.      the process or system is regularly verified by Alexssa Enterprises, Ltd., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
 Date                             Signature